IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF LONDYN W. & ITALLY W.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF LONDYN W. AND ITALLY W., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

PARRIS J., APPELLANT.

Filed November 20, 2018.    Nos. A-18-211, A-18-212.

Appeals from the County Court for Madison County: MICHAEL L. LONG, Judge. Affirmed.

Jack W. Lafleur, of Moyer & Moyer, for appellant.

Gail E. Collins, Deputy Madison County Attorney, for appellee.

Sharon Joseph, guardian ad litem.

PIRTLE, BISHOP, and ARTERBURN, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

Parris J. appeals from an order of the county court for Madison County sitting as the juvenile court that terminated her parental rights to her two daughters, Londyn W. and Itally W. On appeal, Parris challenges the court's findings that termination of her parental rights was warranted under Neb. Rev. Stat. § 43-292(2), (4), and (6) (Reissue 2016) with respect to both Londyn and Itally and under § 43-292(7) with respect to Londyn and that termination was in the children's best interests. She also appeals the court's determinations that two witnesses were not credible and that she first entered an inpatient treatment program in September 2017. For the reasons that follow, we affirm.

## II. BACKGROUND

On June 9, 2015, the county court for Colfax County sitting as the juvenile court received an affidavit from a Colfax County sheriff's deputy which stated that Londyn's father, John W., threatened to take her away from her maternal great-grandparents, Elden J. and Doraine J., who were caring for her at the time. Elden and Doraine feared for Londyn's safety due to John's violent nature, which included then-pending domestic assault charges stemming from an incident that occurred in Londyn's presence. The court ordered that the Nebraska Department of Health and Human Services (the Department) take emergency custody of Londyn.

Thereafter, while Londyn was placed with Elden and Doraine, Parris and John exercised a supervised visit with her on June 11, 2015. The visitation worker smelled a strong odor of marijuana coming from Parris and John. At a subsequent visit on June 18, Parris arrived 90 minutes late.

On June 22, 2015, the State filed a petition to adjudicate Londyn as a minor under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because she was being primarily cared for by Elden and Doraine rather than her parents. The initial assessment worker from the Department, noted concerns that Elden and Doraine did not have medical releases for Londyn despite caring for her at great length. Sometimes Parris would drop off Londyn at Elden and Doraine's home without saying how long she planned to be gone. In its petition, the State also alleged that Londyn had witnessed a domestic assault committed by John and that a criminal case was then-pending in relation to that incident. When the initial assessment worker met with Parris in July 2015, Parris was covered with bruises. Although Parris first claimed she was bruised while riding a four-wheeler, she later acknowledged that the bruises were caused by John physically assaulting her.

By early August 2015, Londyn was physically placed with Parris but remained in the Department's custody. However, Londyn was again removed from Parris on September 22, following another incident of domestic violence between John and Parris at which Londyn was present. Parris appeared at a hearing with two black eyes, one of which was nearly swollen shut, due to the domestic assault by John. Londyn was removed, in part, because Parris did not report the domestic violence to authorities or obtain a protection order against John. The court removed Londyn and placed her with Elden and Doraine. The court further ordered that Londyn be returned to Parris' care as soon as Parris met the Department's safety requirements. Londyn was returned within a week.

Parris obtained a protection order against John shortly thereafter. Jean Cornwell of the Department was the family services specialist assigned to manage the case. She urged Parris to seek counseling for domestic violence at that time. On December 21, 2015, Parris moved to vacate the protection order entered against John in violation of the safety plan.

The record shows that Parris remained in contact with John throughout the pendency of this case. In August 2017, for example, Parris allowed Londyn to speak to John on the telephone. Additionally, Parris spoke to John on the telephone in October. John eventually relinquished his parental rights to both children in this case and will only be mentioned as is relevant to our analysis as to Parris.

The State filed an amended petition on November 2, 2015. This amended petition was substantially the same as the original petition, alleging Londyn was a minor under § 43-247(3)(a) but added language that indicated it was through no fault of Parris. On November 10, Parris entered a no contest plea to the amended petition, and Londyn was adjudicated as a minor under § 43-247(3)(a).

A safety plan was created on December 29, 2015. This plan set forth two priority need goals: that Parris demonstrate the use of coping skills when she became angry in order to avoid physical violence and that Parris provide a safe and stable living environment for Londyn. Various strategies and services were also detailed, including that the Department would provide family support services, individual therapy, and family therapy. Cornwell, who worked with the family from September 2015 to December 2016, said that securing appropriate housing was the main goal for Parris during late 2015. Parris had been evicted from her apartment in Columbus in the fall of 2015 due to unpaid rent.

At a meeting during February 2016, Parris informed Cornwell that she was pregnant and claimed the pregnancy resulted from John physically assaulting her in September 2015. Based on Itally's birthdate in August 2016, Cornwell knew this assertion to be false.

On May 5, 2016, Bruce Mitchell, a drug investigator with the Nebraska State Patrol, initiated a controlled buy of methamphetamine from Parris at her home via his confidential informant. Londyn was staying with Doraine at that time. Following the purchase, Mitchell obtained a search warrant for Parris' residence, which was executed on the morning of May 6. In the course of that search, Mitchell located and seized a number of syringes, bongs, a meth pipe, empty baggies with narcotics residue, scales, and cell phones. Thereafter, a criminal information was filed that charged Parris with possession of methamphetamine with intent to deliver, a Class II felony, and possession of a controlled substance, methamphetamine, a Class IV felony. Immediately following Parris' arrest, Londyn was placed in Doraine's care. Londyn has continuously remained in an out-of-home placement since her removal on May 6. This case remained pending as of the time of the termination hearing.

Cornwell instructed Doraine not to allow Parris access to Londyn under any circumstances. However, on May 9, 2016, Cornwell became aware that Doraine had released Londyn to Parris when Parris showed up at Doraine's home and told her that the arrest was a hoax. Cornwell began searching for Londyn and started the process to send out a protective service order, which is akin to an Amber Alert but notifies only law enforcement and child services. Parris became aware of Cornwell's efforts and agreed to meet and surrender Londyn at Doraine's home. On May 9, the State requested the court approve an emergency temporary change in placement from Parris to Doraine, which the court subsequently ordered.

After John was arrested on May 9, 2016, for driving with a suspended license, Cornwell found out that Parris was with John at the time. He was driving Parris' vehicle at the time of the arrest, and Parris was a passenger.

Parris was admitted to an emergency room in Norfolk for unknown reasons on May 14, 2016. Because Parris was pregnant at the time, the Department was notified that her urine tested positive for methamphetamine. A hair follicle test of Londyn on May 20 was positive for THC.

Despite her arrest and positive drug tests, Parris resisted completing any case goals focused on substance abuse. Cornwell also noted that Parris was unwilling to work with family support, contending that she would do it herself and that she had priorities other than working with family support.

Itally was born on August 9, 2016. At birth, she tested positive for methamphetamine and exhibited signs of withdrawal, including shakiness. Due to concerns that Parris might abscond with Itally, Parris was restricted to seeing Itally only in the neonatal intensive care unit when a nurse was present. Itally was immediately placed in the custody of the Department. Upon release from the hospital, the Department placed Itally in the physical care of foster parents, Brent T. and Deborah T., on August 13, where she has remained. The foster parents are related to the family as Doraine is Deborah's paternal aunt. The State filed a petition in the juvenile court of Platte County on August 17, which alleged that Itally fell within the meaning of § 43-247(3)(a) based primarily on safety concerns with regard to John and drug abuse concerns regarding Parris. An order was entered by the county court for Platte County sitting as a juvenile court on August 22, removing Itally from Parris' care due to her ongoing drug use.

At an appointment later in August 2016, Itally's pediatrician recommended a new formula that would not upset Itally's stomach as much. Although both Parris and Deborah were present for the appointment, only Deborah immediately purchased the new formula. Parris did not provide the new formula during her visitations for 3 weeks after the doctor's recommendation.

Parris fell asleep during a visitation in August 2016, and the visitation worker had to wake her up. In the weeks following Itally's birth, Parris discussed with the visitation worker a plan to voluntarily relinquish her parental rights in order to then get her children back from whomever was named their foster parent. During October, Parris told a visitation worker that she did not know Itally and did not care anymore. Throughout this time period, visitation workers were concerned that Parris lacked a real bond with Itally. She again discussed voluntarily relinquishing her parental rights as a way to avoid complying with the State and to also remain in her children's lives by socializing with whomever became the custodians of the children.

In September 2016, Brooke Pelster-Hess, a counselor at Oasis Counseling, evaluated Parris and diagnosed her with severe methamphetamine use disorder and moderate alcohol use disorder. She recommended that Parris attend a medium-intensity, long-term residential treatment program with a built-in parental component. However, Parris refused the suggestion of entering a drug rehabilitation program at that time.

On September 23, 2016, Londyn was again adjudicated as a minor under § 43-247(3)(a) on the amended petition. On December 5, Itally was adjudicated as a minor under § 43-247(3)(a). Also in December, both cases were transferred to Madison County based on the family living in that county.

Throughout 2016, visitation workers were concerned that Parris either did not provide necessary supplies during visits such as baby wipes and snacks or that Parris only provided supplies that she obtained from Doraine. Doraine would sometimes send Parris money to purchase the requisite supplies. For example, in November, when Doraine did not send money to Parris in the diaper bag, Parris was unable to feed Londyn during a visitation.

Doraine continued providing the supplies Parris needed for visitations with the children during 2017. Doraine left cash for Parris on November 19 and bought groceries for her on the following day. On December 19, during a trip to WalMart with Parris, Doraine bought Christmas toys and gifts. Parris gave the gifts to the children to celebrate Christmas, including heavier coats and a LeapPad children's tablet. During a 3-hour visitation on Christmas Day, Doraine brought breakfast for Parris and the children, picked up the room, and twice changed diapers. Doraine also continued to pay for meals when they went out to eat in December. Makala Braun, a family support worker during this period, opined that it was very important that Parris have someone else present during visitations. She noted that Doraine regularly supplemented Parris' parenting and occasionally was substituted for Parris' parenting.

Visitation workers also expressed concern regarding Parris' lack of focus on the children during visitations. Throughout 2016, visitation workers observed Parris spend an inordinate amount of time on her cell phone during visits, habitually run errands, neglect to do things such as change a diaper or feed the children until prompted, or end visits early for no appropriate reason. Parris would also at times leave the children while she went into another room to fix her hair and makeup or leave the children inside while she went outside to smoke with a friend.

Although Parris was still on her cell phone during some visits her attention to the children improved in the latter portions of 2017. She was observed to become more engaged in changing diapers, cuddling, playing games, providing appropriate meals, and putting together puzzles with the children. Parris would also at times provide home-cooked meals for the children and brush their hair. There were few opportunities for Parris to discipline the children or otherwise provide structure during visitations as it was mostly playtime.

Outside of visitation, Parris did not regularly utilize services offered to her. Although Cornwell met with Parris and discussed her lack of follow through on her recommendations, Parris continued to decline family support services and would cancel appointments, sometimes for fictional reasons. This continued following the transfer of the case to Madison County. In March 2017, for example, Parris cancelled numerous meetings and only had a total of 90 minutes of contact with her family support worker even though she was authorized for up to 5 hours per week during that month.

In early 2017, Londyn began staying overnight at the foster parents' home part of the time. During this time period, Londyn's stays were usually for a couple of days or a weekend but not longer than a 3-day period. On March 7, Londyn moved into the foster parents' home full time and has remained there since. Deborah testified that Londyn and Itally get along well together and act very much like siblings.

While the foster parents were eating lunch with Londyn and Itally at a restaurant in Columbus on March 19, 2017, one of Parris' uncles, Kevin, unexpectedly walked into the restaurant and back out immediately, which seemed odd to Deborah. The foster parents began wrapping up their food in order to leave. Kevin then reentered, purchased cookies, and brought them over to Londyn. Although Deborah asked Kevin to leave, he bent down to speak with Londyn instead. The foster parents began leaving the restaurant when Kevin grabbed Londyn and led her away from them. As this was unfolding, a police officer on routine patrol drove through the restaurant parking lot. Kevin passed Londyn off to Elden and Doraine, who had appeared from

another nearby restaurant's parking lot. Kevin told the officer that Deborah and Brent had spanked Londyn and may have even broken her arm.

The officer returned Londyn to Deborah, who agreed to take Londyn to the police station in order to check her for signs of abuse. Londyn had been crying throughout the incident but stopped shortly after being returned to Deborah. An examination at the police station showed that Londyn had no bruising, marks, or other injuries and had no trouble moving her arms. Londyn was then returned to the foster parents' care.

Three days later, on March 22, 2017, daycare workers observed a woman who they believed to be Parris enter the daycare that Londyn and Itally attended. Keshia Hadenfeldt, a Department children and family specialist and Parris' case manager after the transfer to Madison County, reported the daycare incident to the same officer who was involved with the restaurant incident. Hadenfeldt noted that Parris was not supposed to have contact with the children at that time until she had produced a week's worth of negative drug tests.

According to Laura Stoltz, a licensed mental health practitioner, Londyn had experienced trauma, insecurity, a lack of stability, and fear due to bouncing between Parris and Doraine and eventually being placed in foster care. These changes in Londyn's placement resulted in developmental trauma affecting her ability to form a secure attachment. According to Stoltz, Londyn's symptoms included difficulty sleeping, clingy behavior, biting herself and others, and intentionally wetting herself in front of adults who take care of her. Stoltz additionally noted that it appeared as though Londyn was developing a secure attachment to her foster parents. Stoltz further noted that Itally likely had already formed a secure attachment to her foster parents because they had provided for her needs throughout her lifetime.

On March 20, 2017, Parris was arrested and charged for allegedly concealing the whereabouts of Chad Board, a person sought by law enforcement on charges related to drugs, firearms, and stolen property. Parris was initially charged as an accessory to a felony, a Class IIA felony, and with falsifying information to a peace officer, a Class I misdemeanor. Due to the charges, Parris spent the night in jail. The charge for falsifying information to a peace officer was subsequently dismissed, and Parris entered a plea of not guilty to the accessory charge. From our record, it appears that this matter remained unresolved at the time of trial in this case.

Parris' drug use continued into 2017 as she tested positive for methamphetamine on February 22. Parris again tested positive for methamphetamine in March. In addition to positive tests, ongoing difficulties existed as to Parris failing to test or supplying insufficient samples. Parris tested positive for meth on April 12 and 13. She tested negative on April 19. Following a hearing on April 24, Sherry Peterson, a juvenile accountability officer, escorted Parris to a restroom to complete a urinalysis at the court's direction. Parris took quite a while and was acting strange according to Peterson. The sample Parris provided to Peterson had a terrible odor and did not activate the test's temperature screening, both of which indicated that it had been produced much earlier.

Although Parris tested positive for methamphetamine on May 3, 2017, she produced samples that were presumptive negatives on May 4 and 10. The presumptive negative samples were not confirmed by lab tests. Parris again tested negative on June 8 and 11. On June 13, Parris

was scheduled to have her first visitation with the children since January. However, this visitation was canceled after Parris tested positive for THC.

On August 14, 2017, the court ordered Parris to submit to a drug test before leaving the courthouse following a hearing. After attempting to urinate four times, a small bottle containing urine fell out of Parris' vagina. Parris then produced an authentic urine sample that tested positive for methamphetamine.

Pursuant to court order, Lynda McCullough, a family and child service specialist from the Department, and a sheriff's deputy walked through Parris' home to evaluate its suitability on April 24, 2017. This home belonged to Elden and Doraine and was near their own home. When McCullough and the deputy arrived, one of Parris' uncles was outside and initially denied that Parris lived there before quickly changing his response. The door was locked when Parris arrived, but Parris did not have a key. She looked under the doormat and whispered something along the lines of "[t]hey were supposed to leave me a key." Once inside, Parris remarked something like "[t]hey always leave the Christmas tree up." No clothing was found in the bedrooms, and the beds had no linens on them. There were no personal items, photos, mail, or hygiene products. McCullough and the deputy concluded that Parris did not actually live in that home.

During a subsequent walk through by Hadenfeldt in November 2017, Hadenfeldt found it odd that various pieces of furniture had notecards on them that said "stay off." However, unlike the visit in August, there were toiletries in the bathroom, there was food in the cupboards, and it appeared as though someone was living there.

On August 17, 2017, Parris entered Seekers of Serenity, an inpatient treatment center, where she was allowed visitations with the children. She was asked to leave the treatment program by staff. She told a family support worker that she was kicked out because she was talking with men. Another family support worker identified that Parris' relationship with a man was a big reason she was asked to leave the inpatient treatment center. Parris left the center on August 28 and did not return.

The next day, on August 29, 2017, the State filed a supplemental petition to terminate the parental rights of Parris and John with respect to Londyn, alleging that termination was proper pursuant to § 43-292(1), (2), (3), (4), (6), and (7) and was in Londyn's best interests. Also on August 29, the State filed a supplemental petition to terminate the parental rights of Parris and John with respect to Itally, alleging that termination was proper pursuant to § 43-292(1), (2), (4), and (6) and was in Itally's best interests. John voluntarily relinquished his parental rights to both children on September 11.

Parris was admitted to Sunrise Place, a short-term residential drug and alcohol treatment center run by Behavioral Health Specialists, on September 6, 2017. Parris was diagnosed with severe stimulant use disorder (amphetamine-type substance) and severe alcohol-use disorder. Throughout her treatment, Parris participated in all scheduled programming and openly shared during lectures and group sessions. Parris regularly attended narcotics anonymous/alcoholics anonymous meetings and attended church every Sunday. Parris also attended lectures and had visitations with her children every weekend. However, Parris struggled to maintain healthy boundaries. Parris partially achieved her goals and was discharged upon completion on October 9.

While Parris was a resident of Sunrise Place, Dr. Eric Snitchler conducted a psychological evaluation on September 22, 2017. Snitchler recommended that Parris be treated for mental health issues, including bipolar and anxiety disorders in conjunction with her ongoing treatment for substance abuse issues.

Upon discharge from Sunrise Place, its program director and substance abuse counselor recommended that Parris enter a halfway house due to her history of chronic relapse and her ongoing struggles with boundaries, healthy relationships, and lack of structure in her life. This was the same recommendation that Pelster-Hess made almost a year prior in September 2016. Parris, however, chose to seek entry into a less structured three-quarter-way house along with engaging in an intensive outpatient (IOP) treatment program with Kathy Ring. The Department agreed with Parris engaging in IOP treatment.

About a month following discharge from Sunrise Place, Parris moved into an Oxford House in Fremont, a three-quarter-way house. The Oxford House had no scheduled programming or onsite therapists, and Parris compared it to a vacation. Because no staff was present at the Oxford House, the residents held one another accountable. Hadenfeldt expressed concerns about the Oxford House to both Parris and her attorney and instructed Parris to return to IOP treatment again after having stopped when she entered the Oxford House.

Parris told Hadenfeldt that she was seeing Ring three times per week for IOP treatment while residing in Oxford House. After numerous requests and heated discussions with Ring, Hadenfeldt received schedules that showed overlap between the IOP treatment sessions and other activities in which Parris was involved. Accordingly, Hadenfeldt was concerned about the veracity of both Ring's documents and Parris' record of attendance.

At trial, Ring testified on Parris' behalf. Separate of the above incident with Hadenfeldt, the court found Ring in contempt for failing to provide records and notes regarding Parris' treatment, particularly original records of Parris' attendance. The contempt was later purged when Ring provided additional records.

Ring testified to providing IOP treatment for Parris, consisting of 24 sessions, occurring at the rate of three sessions per week. Ring said each session was three hours long. Although exhibit 150 purportedly showed Parris' attendance at those sessions as well as additional weekly group sessions, there remained significant concerns that Ring may have artificially created the attendance record. Ring struggled to find original records and acknowledged that most recording of attendance was done by participants on their honor. Ring discharged Parris upon her completion of IOP treatment on December 27, 2017.

During the State's rebuttal, Kristen Neuhalfen opined that Parris' treatment program with Ring did not qualify under the Department's regulations as it did not actually consist of regularly scheduled therapy sessions. Ashley Staroska was also recalled during the State's rebuttal and mentioned previous issues with Ring's therapy practice, including an incident when Ring claimed that a person was in therapy with her when the person was not. After a judge in another case declared that he would no longer accept Ring's evaluations, Staroska directed all her workers not to accept them either. In its order of termination, the juvenile court specifically found Ring's testimony not to be credible.

In addition to entering treatment programs, Parris has improved her visitation attendance and maintained sobriety. Hadenfeldt acknowledged that Parris had consistently attended visitations with her children since the filing of the termination motion in August 2017. Moreover, Parris had no positive drug tests since October when she was discharged from Sunrise Place. During November, for example, Parris was tested for drugs four times weekly, and all the results were negative.

Parris never provided documentation of any employment throughout the pendency of this case, however, and Department of Labor records demonstrated no employment from the early part of 2015 through December 2017. Nevertheless, Parris claimed at various times that she was working for her grandfather or at Squeeky Kleen in Columbus, Nebraska. It seems Parris did work for Squeeky Kleen at some point because Squeeky Kleen informed Parris' case manager in July that Parris had been terminated as too many issues surrounded her, including issues involving stolen property. Additionally, Elden testified that Parris had been working on his farm clearing trees throughout 2017.

Based on her involvement throughout the case, Cornwell, who had worked with Parris from September 2015 through December 2016, opined that Parris did not gain any understanding into her problems and further opined that Parris had made no progress regarding her drug use. Based on all her observations during her time on the case, Cornwell opined that Parris could not provide for her children.

Hadenfeldt, her case manager since January 2017, opined that Parris had not come to understand the problems underlying this case and that she had not made progress toward changing her behaviors. She also noted that all visitations had been supervised and opined that Parris was unable to provide care and protection for the children or a stable and safe living environment. Hadenfeldt further opined that Parris lacked a positive bond with either child and that termination of Parris' parental rights was in the children's best interests.

After hearing testimony from 49 witnesses and reviewing a large volume of exhibits, the court issued its decision on February 5, 2018, terminating Parris' parental rights to both Londyn and Itally. The court held that the State had proved by clear and convincing evidence that the requirements of § 43-292(2), (4), and (6) were met regarding both Londyn and Itally and that the requirements of § 43-292(7) were met regarding Londyn. Additionally, the court held that termination of Parris' parental rights was in the children's best interests. The court also found specifically that the testimony of Ring and Parris' father was unbelievable and deserved little or no weight.

As to § 43-292(2), the juvenile court found that Parris had continuously used methamphetamine and other drugs from May 2016 to August 2017. She also distributed methamphetamine and associated with persons involved in illegal drugs, weapons, and stolen property. Her drug use led to her only having one visit with her children between February and September 2017 when she was required to have clean drug tests over a 7-day period in order to have visitation. The court noted that she did not enter into a treatment program for more than a year following the recommendation that she enter long-term residential treatment.

Regarding § 43-292(4), the court again noted Parris' long history of drug abuse going back to a methamphetamine-related conviction in 2012. The court further noted that despite past efforts

for rehabilitation, Itally tested positive for methamphetamine at the time of her birth and Parris did not begin treatment until following the petition for termination in September 2017.

As to § 43-292(6), the court found that the State had made reasonable efforts to preserve and unify the family. The court noted that the Department had worked with Parris on a safety plan for protecting herself and the children from John, but that Parris sought dismissal of the protection order. The court also noted that substance abuse services were offered along with foster care, family support, and financial assistance. Despite these efforts Parris was unable to maintain a drug-free lifestyle or maintain stable housing.

Finally, as to § 43-292(7), the court found that Londyn had been in out-of-home placement for 15 of the most recent 22 months preceding the filing of the termination motion.

As to best interests of the children, the court noted that Parris did not make any efforts toward sobriety until shortly before the hearing. The court found that she had a "seriously unstable personal life" throughout the pendency of the two cases. The court noted that the efforts made by Parris following the filing of the termination motion were late in coming and followed a significant period of choosing to live in a world of drug abuse. The court found that the recent evidence must be viewed with suspicion given Parris' efforts as recently as August 2017 to deceive the court by surreptitiously bringing urine to a drug test conducted by the Department. As such, the court found that the children should no longer be suspended in foster care and that termination of Parris' rights was in their best interests.

Parris now appeals.

## III. ASSIGNMENTS OF ERROR

Parris argues on appeal, restated, that the trial court erred in finding that (1) a statutory ground for termination under § 43-292 existed, (2) termination of her parental rights was in the children's best interests, (3) the testimony of Parris' father and Ring was unbelievable, and (4) she began inpatient treatment at Seekers of Serenity in September 2017.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Kane L.*, 299 Neb. 834, 910 N.W.2d 789 (2018). When the evidence is in conflict, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016). Clear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proven. *In re Interest of Brettany M. et al.*, 11 Neb. App. 104, 644 N.W.2d 574 (2002).

## V. ANALYSIS

### 1. STATUTORY GROUND FOR TERMINATION

In order to terminate parental rights under § 43-292, the State must prove by clear and convincing evidence that one or more of the statutory grounds listed in the section have been satisfied and that termination is in the child's best interests. *In re Interest of Nicole M.*, 287 Neb.

685, 844 N.W.2d 65 (2014). Only one statutory ground for termination needs to be proved in order for parental rights to be terminated. *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012).

On appeal, Parris argues that the trial court erred in finding that the requirements of § 43-292(2), (4), and (6) were satisfied with respect to both Londyn and Itally and that the requirements of § 43-292(7) were satisfied with respect to Londyn. The State argues in response that the above statutory grounds for termination were proved and that Parris' recent improvements cannot overcome years of parental dereliction. We agree with the trial court that statutory grounds for the termination of Parris' parental rights exist in this case.

We note at the outset that the requirements of § 43-292(7) are clearly met with respect to Londyn. Section 43-292(7) provides for termination of parental rights when a minor child has been in an out-of-home placement for 15 or more out of the most recent 22 months. Numerous witnesses testified that Londyn was removed from Parris' care on May 6, 2016, and had continuously been in out-of-home placement since then. This removal of Londyn followed on the heels of Parris' arrest for selling methamphetamine on May 5. From May 6, 2016, to August 29, 2017, when the supplemental petition was filed in this case, Londyn had already been continuously in out-of-home placement for 15 months and 3 weeks.

Because Itally had not been placed in out-of-home placement for 15 months at the time the termination motion was filed and at least one statutory ground for termination needs to be proved in a termination proceeding, we will focus our attention on § 43-292(2), the requirements of which the trial court found were met with respect to both Londyn and Itally. Much of the following analysis also supports the trial court's finding that § 43-292(4) and (6) were also satisfied with respect to both children.

Section 43-292(2) provides for the termination of parental rights when the parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection. Our courts have consistently held that a parent need not have physical possession of a child to demonstrate the existence of neglect as contemplated by § 43-292(2). *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

The questions of what constitutes neglect and necessary parental care and protection are generally determined on a case-by-case basis. *In re Interest of Elijah P. et al.*, 24 Neb. App. 521, 891 N.W.2d 330 (2017). Under § 43-292(2), the State must establish that the parental neglect was substantial and continuous or repeated. *Id*. Last-minute attempts by parents to comply with rehabilitation plans do not prevent termination of parental rights. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Habitual drug abuse and drug-related arrests and convictions may be evidence of a parent's substantial and continuous neglect or failure to provide necessary parental care and protection under § 43-292(2). See *Wayne G. v. Jacqueline W.*, 21 Neb. App. 551, 842 N.W.2d 125 (2013). Exposing children to domestic turmoil caused by a continued relationship with an assaultive partner may also be evidence of neglect under § 43-292(2). See *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

This case began following John's attempt to take Londyn from her great-grandparents who were caring for her at the time. The evidence demonstrated that John had physically assaulted

Parris while Londyn was present and on at least two occasions thereafter. Parris was granted a protection order against John in 2015 but requested that it be dismissed a few months later. The record shows that Parris was still seeing John as recently as October 2017.

During the early portion of this case, Londyn was frequently dropped off to Elden and Doraine for extended or uncertain periods by Parris. This flipping back and forth caused developmental trauma to Londyn, which resulted in bed wetting and biting. Since being placed with foster parents in March 2017, Londyn has improved and begun developing a secure attachment to her foster parents.

The record shows that Parris was frequently under the influence of narcotics from the time this case began in 2015 until the time that the State filed to terminate her parental rights in August 2017. It was not until the termination motion was filed that Parris finally entered a residential treatment program despite that recommendation having been made a year before. After completing inpatient treatment, Parris chose to move into the Oxford House--which she compared to a vacation--and began therapy with Ring. This course of action was contrary to her counselor's recommendation. Ring's program can charitably be described as relaxed and appears to be of dubious value. The Oxford House may well have been an appropriate three-quarter-way house, but the evidence established that Parris was not yet ready for such a placement but needed the more structured environment of a half-way house. It is clear that Parris' work to remedy her drug abuse lacked much seriousness or urgency until the amended petitions for termination were filed in August 2017.

Parris' recent efforts toward sobriety are commendable but do not erase years of habitual drug use. Parris' propensity for methamphetamine is well-documented, including a conviction in 2013 and a 2016 arrest, still pending at the time of the termination hearing, for selling methamphetamine to a confidential informant. On numerous occasions, Parris attempted to deceive the court by inorganically providing clean urine through various tricks when she was drug tested. When Parris produced her own urine, it routinely tested positive for methamphetamine. This included a stint of at least 6 months beginning in January 2017 when she was not allowed visitations with her children because she could not produce a week's worth of negative drug tests. Based on her history of attempting to deceive the court, it is understandable why the trial court was suspicious of Parris' more recent efforts particularly when she insisted on seeing a substance abuse therapist whose program of treatment was suspect and not well documented and who had a history of falsifying records before other courts.

During periods of time when Parris was allowed visitation, she was often distracted from taking care of Londyn and Itally. For example, visitation workers observed Parris spending excessive time on her phone, leaving the children inside when she went outside to smoke, or leaving the children in another room while she applied her makeup. Parris never progressed to a point of being allowed more relaxed visitations throughout the pendency of the case.

Visitation workers also observed that Parris often ceded parenting duties to her grandmother, Doraine. The initial petition to adjudicate Londyn as a minor under § 43-247(3)(a) was filed after Parris left Londyn with Elden and Doraine for extended periods of time without providing them with a medical authorization in case of emergencies. Additionally, throughout the pendency of this case, Doraine provided the supplies necessary for visitations. As recently as

December 2017, Doraine supplied the gifts and food for a Christmas celebration and took care of the children during that celebration.

Parris never demonstrated that she could independently provide for her children. She never maintained any type of employment that paid a wage that registered with the Department of Labor. She claims to have performed work on her grandfather's farm and for her father's friend who operated a company called Squeeky Kleen. However, no proof of wages was ever provided and the owner of Squeeky Kleen indicated to the Department that Parris was let go due to concerns about thefts. By in large, Parris appears to have survived on the generosity of her grandparents coupled with occasional work and at least on one occasion, the sale of methamphetamine. As a result, Parris was twice evicted from apartments during the pendency of the case. It appears that absent the provision of housing and support by her grandparents, Parris would have little if any ability to provide for her children.

Parris contends that her more recent efforts and improvements--especially those that came after the State's filing of supplemental petitions on August 29, 2017--ought to be considered determinative. However, the record is replete with instances that show Parris' repeated neglect of Londyn and Itally and failure to provide them with necessary parental care and protection. Many of those issues still existed or were likely to recur at the time of the termination hearing. Based on the foregoing, we agree with the trial court and thus affirm its finding that a statutory ground for the termination of Parris' parental rights exists in this case. We agree that the State has proven a statutory basis for termination pursuant to § 43-292(2).

## 2. BEST INTERESTS OF CHILDREN

Because the State proved the existence of a statutory ground for termination of Parris' parental rights, we turn to whether the State also showed that termination was in the best interests of Londyn and Itally. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *In re Interest of Austin G.*, 24 Neb. App. 773, 898 N.W.2d 385 (2017). Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.*

The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. *In re Interest of Kendra M. et al., supra*. In discussing the constitutionally protected relationship between a parent and a child, our courts have held: ""''Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being."''" *Id.* at 1033-34, 814 N.W.2d at 761. The best interests analysis and the parental fitness analysis are fact-intensive inquiries, and while both are separate inquiries, each examines essentially the same underlying facts as the other. *In re Interest of Nicole M., supra*.

For example, in finding that termination of parental rights was in the children's best interests, the Nebraska Supreme Court in *In re Interest of Sir Messiah T. et al.*, 279 Neb. at 911, 782 N.W.2d at 329, confronted facts similar to those before us:

> While we agree with the juvenile court that the record shows that [the mother] has made recent progress in achieving the goals set forth in the rehabilitation plans, these efforts have largely come after the State filed the petition to terminate her parental rights. Even taking these efforts into account, [the mother] has been unable to keep a job, abstain from alcohol, or successfully parent her children unsupervised.

The Supreme Court also dealt with very similar circumstances in another more recent case:

> We examine the best interests of the children in the context of [the mother's] repeated failure to provide a safe, stable, and drug-free environment for the children. [The mother's] actions did not reflect her concern for the best interests of the children. Her failure to attend visitations with the children demonstrates a lack of motivation for reunification. The inconsistency in her attendance at the visitations led her own family members to decline to continue their supervision.

*In re Interest of Joseph S. et al.*, 291 Neb. at 963-64, 870 N.W.2d at 149.

In her brief on appeal, Parris contends that recent instances of her positive bond and attachment with Londyn and Itally show that termination of her parental rights is not in the children's best interests. Meanwhile, the State argues that Parris' habitual drug use and general inability to provide stability for Londyn and Itally show that their best interests are served by terminating Parris' parental rights. We agree with the trial court that termination of Parris' parental rights is in the best interests of the children.

During the time between the filing for termination at the end of August 2017 and the beginning of trial in December, Parris appears to have taken steps to improve herself. We commend her for these efforts. In particular, we note that Parris has not tested positive for drug use since October. However, we also note that the record shows Parris consistently used methamphetamine throughout this case up until August. This includes an incident when Parris concealed a bottle of urine in order to deceive a court-ordered drug test just 2 weeks before the State filed its supplemental petitions for termination in August.

Parris entered an inpatient treatment program on August 17, 2017. This came almost a year after a counselor first recommended that she attend a medium-intensity, long-term residential treatment program with a built-in parental component, but Parris did not heed that advice. Parris' initial efforts at sobriety in August seem questionable as she was asked to leave the program because of noncompliance with the center's rules.

Parris then successfully completed treatment at Sunrise Place on October 9, 2017. This, again, is commendable. However, upon discharge, Parris chose not to heed her counselor's suggestions to enter a half-way house but chose instead to enter a three-quarter-way house, comparing its more relaxed nature to a vacation. She also began IOP treatment with Ring, a counselor who lacked diligent structure and did not hold participants strictly accountable. In other words, Parris has sought out providers that provide minimal structure and accountability. The bulk

of Parris' efforts at improvement occurred only after the State filed for termination. Even accounting for these efforts, no evidence was presented to show that Parris would be able to care for Londyn and Itally if they were placed with her on a full-time basis. She has not obtained employment but continues to survive solely on the benevolence of her grandparents.

The record shows that Parris never had unsupervised visitations with Londyn and Itally at any time throughout the duration of this case. Moreover, during visitations, Parris often relied on support from Doraine or visitation workers. Doraine frequently provided the necessary supplies for visitations and would give Parris money to pay for the children's meals. At times, Parris left the children in a different room while she applied her makeup or went outside to smoke. Her lack of engagement during visitations undermines her desire for reunification.

Additionally, Elden and Doraine cared for Londyn, who was born in September 2014, off and on from at least June 2015 through March 2017. Londyn bounced between Parris' home and Elden and Doraine's home for much of that early period. In March 2017, Londyn moved in full time with the foster parents. Itally began living with the foster parents shortly after her birth in August 2016. Both children remained with the foster parents through the time of trial. In contrast to her past symptoms of developmental trauma, Londyn began developing a secure attachment to her foster parents, which has led to fewer symptoms such as difficulty sleeping and biting herself. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Alec S., supra*. Unfortunately in this case, the late efforts made by Parris still did not establish any reasonable timeline in which it was foreseeable that she could independently care for and support her children. For these reasons, we agree with the trial court that the State demonstrated by clear and convincing evidence that termination of Parris' parental rights was in the best interests of Londyn and Itally.

### 3. WITNESSES' CREDIBILITY

On appeal, Parris argues that her father was credible because his testimony was uncontroversial and uncontroverted. Parris also argues that the trial court's finding that Ring was not credible is antithetical to its finding that she attended an IOP treatment run by Ring. Although the State does not address the trial court's determination regarding Parris' father, it does point out the myriad evidence that directly undermined Ring's credibility. Upon our review, we affirm the trial court's determination that the testimony of Parris' father and Ring was unbelievable.

The credibility and weight of witness testimony are for the fact finder to determine, and witness credibility is not to be reassessed on appellate review. *State v. Heng*, 25 Neb. App. 317, 905 N.W.2d 279 (2017). The trial court specifically found "that the testimony of . . . the mother's father, and Kathy Ring, the mother's current therapist, to be unbelievable after observing the witnesses on the stand and listening to their testimony." The court also said it gave little or no weight to their testimony during trial. Because the trial court had the benefit of actually observing these two witnesses, we ought to give great weight to the court's finding that their testimony was unbelievable. Furthermore, on our de novo review of the record, there appears to be ample support for the trial court's findings.

In particular, Parris' father was evasive during cross-examination, resulting in the court instructing him on multiple occasions to directly answer the questions posed to him. Moreover,

despite Parris' contention otherwise, portions of his testimony were directly controverted by other evidence. With respect to Ring, the trial court was presented with myriad evidence that cast serious doubt on the legitimacy of her treatment methods, recordkeeping, and honesty. The trial court's credibility determinations regarding the testimony of Parris' father and Ring are neither against the weight of the evidence nor a clear abuse of discretion, and thus we affirm with respect to these findings.

### 4. INPATIENT TREATMENT

Parris argues that the trial court erred in finding that she started inpatient treatment at Seekers of Serenity in September 2017. Numerous witnesses testified that Parris began inpatient treatment at Seekers of Serenity in August and that she thereafter entered inpatient treatment at Sunrise Place in September. While we therefore agree with Parris and find that the trial court erred regarding the precise date that Parris first entered inpatient treatment, we find that this is harmless error. The trial court's decision and rationale is only negligibly impacted, if at all, by the erroneous finding, and there is clear and convincing evidence to support the trial court's decision.

### VI. CONCLUSION

Based on our de novo review of the record, we conclude that the State has proved a statutory ground for terminating Parris' parental rights to Londyn and Itally and that termination is in their best interests. We find that the trial court's credibility determinations were not against the weight of the evidence. We further find that the trial court's error regarding the date that Parris began an inpatient treatment program is harmless error. We therefore affirm the termination of Parris' parental rights to Londyn and Itally.

AFFIRMED.